DECISION
In this declaratory judgment action, filed by Michael and Jeffrey Derderian ("Derderians") pursuant to G.L. 1956 § 9-30-1 et seq., each party has moved for summary judgment. At issue is whether Essex Insurance Co. ("Essex") has a duty to defend the Derderians against the state's criminal prosecution of them on charges of involuntary manslaughter.
 I Facts and Travel
On February 20, 2003, a fire occurred at the Station nightclub in West Warwick, Rhode Island, claiming the lives of one hundred people. On December 9, 2003, a Rhode Island grand jury returned separate indictments against Michael Derderian and Jeffrey Derderian. Counts One through One Hundred of the respective indictments alleged that the Derderians "without malice aforethought, perform[ed] a lawful act with criminal negligence . . . which on February 20, 2003 unintentionally and proximately caused the death of [the victims], in violation of § 11-23-3
of the General Laws of Rhode *Page 2 
Island. . . ."[1] Counts 101 through 200 alleged that the Derderians "without malice aforethought, perform[ed] an unlawful act not amounting to a felony, to wit, the violation of § 23-28.6-15 of the General Laws of Rhode Island . . . which unintentionally and proximately caused the death of [the victims], in violation of § 11-23-3 of the General Laws of Rhode Island. . . ."[2]
On March 24, 2002, Essex Insurance Company ("Essex") had issued an insurance policy ("Policy") to Michael Derderian. The Policy states that the named insured and mailing address is The Station, c/o Michael Derderian, 6500 Post Road, North Kingstown, RI 02852. The Policy covered the period from March 24, 2002 to March 24, 2003. The relevant portions of the Policy state:
 COVERAGE A BODILY INJURY AND PROPERTY DAMAGE LIABILITY
 1. Insuring Agreement
 a. We will pay those sums that the insured becomes legally obligated to pay as damages because of `bodily injury' or `property damage' to which this insurance applies. We will have the right and duty to defend the insured against any `suit' seeking those damages. However, we will have no duty to defend the insured against any `suit' seeking damages for `bodily injury' or `property damage' to which this insurance does not apply. We may, at our discretion, investigate any `occurrence' and settle any claim or `suit' that may result.[]
 b. This insurance applies to `bodily injury' and `property damage' only if:
 (1) The `bodily injury' or `property damage' is caused by an `occurrence' that takes place in the `coverage territory'; and *Page 3 
 (2) The `bodily injury' or `property damage' occurs during the policy period.
 c. Damages because of `bodily injury' include damages claimed by any person or organization for care, loss of services or death resulting at any time from the `bodily injury'. (Policy § I.A.1.)
Occurrence means "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (Policy § V.13.) The coverage territory includes the United States. (Policy § V.4.a.) The Policy defines bodily injury as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time." (Policy § V.3.) Property damage is defined as:
 a. Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or
 b. Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the `occurrence' that caused it. (Policy § V.17.)
The Policy defines suit as
 [A] civil proceeding in which damages because of `bodily injury', `property damage' or `personal and advertising injury' to which this insurance applies are alleged. `Suit' includes:
 a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
 b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent. (Policy § V.18.)
Lastly, the Policy states that "[w]here there is no coverage under this policy, there is no duty to defend." (Policy at Combination General Endorsement Form M/E-001 (4/00).) *Page 4 
Pursuant to the Policy and G.L. 1956 § 12-28-5, [3] the Derderians demanded that Essex provide them a defense against the criminal prosecutions arising from the December 9, 2003 indictments. Essex refused to provide such a defense, maintaining that the Derderians were not entitled to such a defense under the terms of the Policy.
On June 28, 2004, the Derderians filed a complaint against Essex alleging that "[b]ecause a verdict against each defendant in the indictments would result in the imposition of civil judgment for liability and damages as provided in § 12-28-5, each indictment constitutes a `suit' under the terms of the Essex policy." (Compl. ¶ 12.) Accordingly, the Derderians' complaint sought a declaratory judgment that Essex has a duty to provide them with a defense to their respective indictments. On August 17, 2004, Essex filed its answer and a counterclaim seeking a declaration that it need not provide or fund the Derderians' defense to the criminal prosecutions. *Page 5 
 II Standard of Review
Rule 56 of the Rhode Island Superior Court Rules of Civil Procedure empowers a trial justice, upon proper motion, to enter summary judgment. Summary judgment should be granted only when "`the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" Stewart v. Sheppard, 885 A.2d 715, 719 (R.I. 2005) (quoting Plunkett v. State, 869 A.2d 1185, 1187 (R.I. 2005)). In considering a motion for summary judgment, the court does not weigh the evidence or make credibility determinations. Weaver v. American PowerConversion Corp., 863 A.2d 193, 200 (R.I. 2004) (citing Palmisciano v.Burrillville Racing Assoc., 603 A.2d 317, 320 (R.I. 1992)). When adversary parties file motions for summary judgment, this Court "shall treat the relevant allegations of both parties in the most favorable light insofar as they oppose the respective motions for summary judgment." RIH Med. Found., Inc. v. Nolan, 723 A.2d 1123, 1125 (R.I. 1999). It is well-established that the "`purpose of the summary judgment procedure is issue finding, not issue determination.'" Estate of Giulianov. Giuliano, 949 A.2d 386, 391 (R.I. 2008) (quoting Industrial Nat'l Bankv. Peloso, 121 R.I. 305, 307, 397 A.2d 1312, 1313 (1979)). However, when both parties move for summary judgment and no genuine issues of material fact exist, this Court must review the record to determine if either party is entitled to judgment as a matter of law. See Dubis v. EastGreenwich Fire Dist., 754 A.2d 98, 100 (R.I. 2000). *Page 6 
 III Law and Analysis A The Insurance Contract
The Derderians argue that because § 12-28-5 provides for entry of a civil judgment in the event of a felony conviction after a trial by jury, the indictments against the Derderians constitute suits under the Policy. Further, the Derderians argue that if the Policy is ambiguous, then this Court should interpret the ambiguity in their favor. Essex contends that the contractual language does not support coverage of criminal defense costs.
It is well-settled that Rhode Island courts apply "`the rules for construction of contracts when interpreting an insurance policy and that [they] shall not depart from the literal language of the policy absent a finding that the policy is ambiguous.'" Lynch v. Spirit Rent-A-Car,Inc., 965 A.2d 417, 425 (R.I. 2009) (quoting Mallane v. Holyoke Mut.Ins. Co. in Salem, 658 A.2d 18, 20 (R.I. 1995) (further citation omitted)). Further:
 `In order to determine whether the policy is ambiguous, we read the policy in its entirety, giving words their plain, ordinary, and usual meaning.' . . . `We refrain from engaging in mental gymnastics or from stretching the imagination to read ambiguity into a policy where none is present.'. . . `If the terms of the policy are ambiguous, subjecting them to more than one reasonable interpretation, `the policy will be strictly construed in favor of the insured and against the insurer.' Id. (quoting Mallane, 658 A.2d at 20
(internal citations omitted).
The plain language of the Policy provides that Essex "will have the right and duty to defend the insured against any `suit' seeking those damages [for `bodily injury' or `property damage' to which the insurance applies]." (Policy § I.A.1.a.) The Policy *Page 7 
defines "suit" as "a civil proceeding in which damages because of `bodily injury', `property damage' or `personal and advertising injury' to which this insurance applies are alleged." (Policy § V.18.) This Court finds that the Policy language unambiguously provides for a defense of the insured only in civil proceedings in which damages are alleged.
The indictments to which the Derderians direct this Court, alleging involuntary manslaughter, neither initiated a civil proceeding nor alleged damages.[4] See Hoyle v. Utica Mut. Ins. Co., 48 P.3d 1256, 1263
(Idaho 2002) (finding that a criminal case is not a "suit for damages" under an insurance policy); Bodell v. Walbrook Ins. Co., 119 F.3d 1411, 1418 (9th Cir. 1997) (stating that "it is well established under California law that an insurer is not obligated to defend criminal proceedings when its policy covers only claims seeking `damages'") (citingJaffe v. Cranford Ins. Co., 214 Cal.Rptr. 567, 570 (Cal.Ct.App. 1985)); Spiegel v. State Farm Fire and Cas. Co., 660 N.E.2d 200, 202
(Ill.App.Ct. 1995) (finding that insured's inability to show that restitution was a possibility in a criminal case precluded insurer's duty to defend under a policy covering damages). The Supreme Court has explained that the existence of a duty to defend depends on the pleadings test, which it defines as follows: `That test requires the trial court to look at the allegations contained in the complaint, and "if the pleadings recite facts bringing the injury complained of within the coverage of the insurance policy, the insurer must defend irrespective of the insured's ultimate liability to the plaintiff."' Progressive Cas. Ins. Co. v.Narragansett Auto Sales, 764 A.2d 722, 724 (R.I. 2001) (quoting PeerlessInsurance *Page 8 Co. v. Viegas, 667 A.2d 785, 787 (R.I. 1995) (quoting Employers' FireIns. Co. v. Beals, 103 R.I. 623, 632, 240 A.2d 397, 402 (1968))). The criminal indictments at issue do not satisfy Rhode Island's pleadings test. Assuming, arguendo, that an indictment, defined as a "formal written accusation of a crime, made by a grand jury and presented to a court for prosecution against the accused person," is a "complaint" under the pleadings test, this Court finds that allegations contained in the indictments are still not covered by the "plain, ordinary, and usual meaning" of the Policy language. Black's Law Dictionary 788 (8th ed. 2004). Accordingly, the Derderians are not entitled to have a defense provided or funded pursuant to the Policy. See Lynch, 965 A.2d at 425.
Regarding the Derderians' argument that § 12-28-5 converted this criminal prosecution into a simultaneous civil proceeding, this Court notes that § 12-28-5 in pertinent part provides:
 (a) Upon his or her final conviction of a felony after a trial by jury, a civil judgment shall automatically be entered by the trial court against the defendant conclusively establishing his or her liability to the victim for any personal injury and/or loss of property that was sustained by the victim as a direct and proximate cause of the felonious conduct of which the defendant has been convicted. The court shall notify the victim at his or her last known address of the entry of the civil judgment in his or her favor and inform him or her that he or she must establish proof of damages in an appropriate judicial proceeding in order to recover for his or her injury or loss.
In terms of statutory interpretation, when this Court "is confronted with a statute that contains clear and unambiguous language, [it] construe[s] the statute literally and accord[s] the terms their plain and ordinary meaning." Lynch, 965 A.2d at 425 (citing Liberty Mut. Ins.Co. v. Kaya, 947 A.2d 869, 872 (R.I. 2008)). Noting that the *Page 9 
Derderians were indicted for multiple counts of two felonies, [5] both forms of involuntary manslaughter, [6] this Court finds that § 12-28-5
does not convert felony criminal prosecutions into simultaneous civil proceedings. See Seddon v. Bonner, 755 A.2d 823, 826 (R.I. 2000) (concluding that "§ 12-28-5 is merely a procedural mechanism or shortcut, whereby the liability of the defendant is established, yet damages must still be proven in an `appropriate judicial proceeding'");Foster-Gardner, Inc. v. National Union Fire Ins. Co., 959 P.2d 265, 282-83
(Cal. 1998) (stating that "a guilty verdict against the insured in the criminal proceeding may well affect the insured's ability to meaningfully defend any subsequent civil action. The fact that damaging, perhaps even irrefutable, findings will be made does not mean that a duty to defend arises in the criminal proceeding.") (citation omitted). In fact, the statute provides for a later civil proceeding to permit a potential victim to prove damages.
In analyzing § 12-28-5, the Supreme Court has not concluded that it converts criminal trials into civil proceedings. In Seddon, the Court said of § 12-28-5:
 The language of the statute clearly and unambiguously provides that upon final conviction, a civil judgment shall automatically enter against the defendant, conclusively establishing his or her liability to the victim for personal injury or loss of property incurred as a result of the felonious conduct for which the defendant was convicted. Following the judgment establishing liability pursuant to § 12-28-5, the trial court must conduct a further proceeding in order to determine the amount of damages suffered by the victim. Seddon, 755 A.2d at 826 (emphasis added). *Page 10 
Neither the plain and ordinary meaning of § 12-28-5, nor the Supreme Court's interpretation of the statute supports the Derderians' argument that § 12-28-5 transforms a criminal case into a simultaneous "civil proceeding in which damages because of `bodily injury', `property damage', or `personal and advertising injury' to which this insurance applies are alleged." (Policy § V.18.) The Supreme Court considers the statute "merely a procedural mechanism or shortcut" and emphasizes that damages must be alleged in a separate proceeding. Seddon, 755 A.2d at 826.
It is well-settled that "[i]n matters of statutory interpretation [a court's] ultimate goal is to give effect to the purpose of the act as intended by the Legislature." State v. Oster, 922 A.2d 151, 160 (R.I. 2007) (citing Webster v. Perrotta, 774 A.2d 68, 75 (R.I. 2001) (further citation omitted)). In construing statutes, courts review "statutory provisions in their entirety, attributing to the act the meaning most consistent with the policies and purposes of the Legislature. . . . [and] glean the intent and purpose of the Legislature `from a consideration of the entire statute, keeping in mind [the] nature, object, language and arrangement' of the provisions to be construed. . . ." In re Advisory tothe Governor (Judicial Nominating Com'n), 668 A.2d 1246, 1248-1249 (R.I. 1996) (quoting Algiere v. Fox, 122 R.I. 55, 58, 404 A.2d 72, 74 (1979)) (internal citations omitted). Examining the entirety of the statute at issue, this Court notes that § 12-28-5 was enacted as part of the Victim's Bill of Rights. Section 12-28-1. The General Assembly explained the legislative purpose of the Victim's Bill of Rights as follows:
 In recognition of the responsibility of the community to the victims of crime, the general assembly declares its intent to ensure:
 (1) That all crime victims are treated with dignity, respect, and sensitivity at all phases of the criminal justice process; *Page 11 
 (2) That whenever possible they receive financial compensation for their injury or loss from the perpetrator of the crime; and
 (3) That the full impact of the crime upon the victim is brought to the attention of the court. Section 12-28-2.
Like the plain and ordinary meaning of § 12-28-5 and the Supreme Court's interpretation thereof, the General Assembly's statement of legislative purpose offers no support for the Derderians' contention that § 12-28-5
has converted felony criminal prosecutions into simultaneous civil proceedings. In fact, as Essex argues, § 12-28-5 is better understood as a mere codification of the functional equivalent[7] of nonmutual[8]
collateral estoppel. *Page 12 
 See Restatement (Second) Judgments § 85, comment e at 299 (1982) (stating that "where the person harmed by the conduct that was criminally prosecuted then brings an action for civil redress against the wrongdoer for the consequences of the conduct[,]" issue preclusion applies); id. § 85(2)(a) at 294 (providing that "[a] judgment in favor of the prosecuting authority is preclusive in favor of a third person in a civil action . . . [a]gainst the defendant in the criminal prosecution . . ."); Aubert v.Aubert, 129 N.H. 422, 427-28, 529 A.2d 909, 912-913 (1987) (finding that defendant's criminal conviction for attempted murder collaterally estopped her from relitigating liability and causation in a subsequent civil suit initiated by the victim). The Supreme Court invoked collateral estoppel in its consideration of § 12-28-5:
 [T]here is a stronger rationale for applying collateral estoppel against a former criminal defendant than for applying it against a party to a prior civil case, since the criminal defendant has had the benefit of the presumption of innocence and the State's obligation to prove any fact essential to the conviction beyond a reasonable doubt. Seddon, 755 A.2d at 828 (quoting Hopps v. Utica Mut. Ins. Co., 127 N.H. 508, 506 A.2d 294, 297 (1985)).
This Court finds that the mere codification of a doctrine resembling collateral estoppel does not covert Rhode Island's felony prosecutions into civil proceedings.
The Derderians, citing Johnson Controls, Inc. v. Employers Ins. ofWausau, 665 N.W.2d 257 (Wis. 2003), urge that the word "suit" should be interpreted broadly when considering an insurer's duty to defend. TheJohnson Controls Court determined that an insured's costs of restoring and remediating damaged property, following receipt of a *Page 13 
potentially responsible party (PRP) letter pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), [9]
are covered damages under commercial general liability[10] policies.Id. at 264. It explained that a PRP letter "is a letter issued by the EPA notifying the recipient that the EPA considers it to be a potentially responsible party for contamination at a given site." Id. at 264 n. 4 (citing 42 U.S.C. § 9622(e)). Further, "Under CERCLA, potentially responsible parties (PRPs) are expected to conduct cleanup or pay for the cleanup performed by others." Id. (citation omitted). The Wisconsin Supreme Court did not find significant that the government, rather than a private party, initiated a CERCLA cost recovery action:
 It makes little sense in determining whether `damages' have occurred under the policy whether the party bringing a legal action for contribution to remediate damaged property is a governmental agency or some other entity. Certainly this distinction was not bargained for, nor is it manifested anywhere in the [commercial general liability] policies. The nature of the relief sought against an insured for damage that it caused should not change based on the identity of the *Page 14 
claimant in a CERCLA cost recovery action. Id. at 278 (footnote omitted).
This Court finds that Johnson Controls is distinguishable from the case at bar because the Derderians' criminal indictments, though initiated by the government, contain no allegations of damages and therefore do not satisfy the Policy's coverage requirement of a suit "seeking . . . damages." (Policy § I.A.1.a.) The Johnson Controls Court also determined that a PRP letter from the EPA constituted a "suit" in which an insurer had a duty to defend because the reasonable insured would expect the insurer to provide a defense. Johnson Controls, 665 N.W.2d at 283. Because the Policy language unambiguously provides for a defense of the insured only in civil proceedings, and an insured has no basis for concluding that the criminal indictments initiate civil proceedings, this Court finds that no reasonable insured could expect Essex to provide or fund a defense in the case at bar. See American Commerce Ins.Co. v. Porto, 811 A.2d 1185, 1192 (R.I. 2002) (establishing that courts "look not at what the insurer may have intended the policy to cover or exclude, but rather what an ordinary reader of the policy would have understood the policy's terms to mean if he or she had read them") (citing Pressman v. Aetna Cas. and Sur. Co., 574 A.2d 757, 760 (R.I. 1990)) (further citation omitted).
 B Public Policy
Additionally, Essex argues that treating criminal prosecutions as proceedings subject to commercial general liability insurance coverage violates Rhode Island's public policy. The Derderians counter that providing a defense would not violate public policy *Page 15 
because the charges in the criminal indictments sound in negligence and allege unintended consequences rather than intentional conduct.
For the purpose of discussion, the Supreme Court has stated that courts are bound "to respect the express terms and conditions of an insurance contract that are not in violation of public policy." Mendez v. Brites,849 A.2d 329, 338 (R.I. 2004) (quoting Amica Mut. Ins. Co. v. Streicker,583 A.2d 550, 554 (R.I. 1990)); see 15 Holmes' Appleman on Insurance, § 113.2 at 386 (2d ed. 2000) (noting that "all insurance contracts are subject to the limitation that neither the insurance policy nor the provisions in the insurance policy violate public policy") (footnote omitted). Courts have established that "[a]ny contract which has for its manifest purpose a tendency to interfere with the due enforcement of law, or which offers a temptation to violate the law, or which undertakes to indemnify another against the consequence of an act which is illegal, is void." Fidelity Deposit Co. of Maryland v. Moore, 3 F.2d 652, 653
(D. Or. 1925) (citations omitted).
The Supreme Court has adopted policies designed to discourage the commission of crimes in insurance cases. In Morin v. Aetna Cas. and Sur.Co., 478 A.2d 964 (R.I. 1984), the Court held that the criminal record of insureds, who were convicted of setting a fire, could be admitted into evidence at a civil trial in which the insureds sued their insurers. Id.
at 967. Our Supreme Court explained:
 To allow [insureds] thereafter to initiate a civil suit against the [insurers] in an attempt to collect the insurance proceeds for the damage caused by the fire while excluding the evidence of their convictions would afford [insureds] the opportunity to reap the benefits of their crimes. To permit such recovery, we believe, would violate all standards of public policy and defy the administration of justice. Id. at 966-67. *Page 16 
Further, the Supreme Court determined, with respect to civil actions arising out of child sexual molestation, that the benefit of providing victims with another source of compensation via insurance proceeds would be "`outweighed by the effect of allowing sexual offenders to escape having to compensate minors for the harm that the courts have established is inherent in such offenses.'" Peerless Ins. Co. v. Viegas, 667 A.2d 785,788 (R.I. 1995) (quoting Whitt v. DeLeu, 707 F.Supp. 1011, 1016 (W.D. Wis. 1989)).
With respect to Counts One through One Hundred of the indictments, alleging the Derderians' criminal negligence, our Supreme Court has addressed public policy considerations affecting a similar issue, punitive damages. In Allen v. Simmons, 533 A.2d 541 (R.I. 1987), the Supreme Court determined that an insurer is not responsible for the punitive damages owed by the insured. Recalling that punitive damages serve to punish the offender, the Allen Court concluded that "[c]ommon sense demands that the burden of satisfying a punitive damage award should remain with the wrongdoer and should not be cast upon the blameless shoulder of the other insureds." Id. at 544.
In Allen, the Supreme Court noted that to obtain punitive damages, one must provide "`evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, that for the good of society and warning to the individual, ought to be punished.'" Id. at 543 (quoting Morin v. Aetna Cas. and Sur. Co.,478 A.2d 964, 967 (R.I. 1984)). Our Supreme Court has defined "criminal negligence" similarly, as conduct that is "aggravated, willful, gross, wanton, or reckless-not simply a departure from the conduct of an ordinary, prudent, and careful individual." State v. Gomes, 590 A.2d 391,393 n. 1 (R.I. 1991); see also Ortiz, 824 A.2d at 485 (defining "criminal negligence" as "`conduct which is such a departure from what would be that of *Page 17 
an ordinarily prudent or careful man [or woman] in the same circumstances as to be incompatible with a proper regard for human life, or an indifference to consequences[]'") (quoting State v. Robbio, 526 A.2d 509,514 (R.I. 1987)).
 Conclusion
This Court declares that the Policy does not entitle the Derderians to coverage for a defense against their criminal prosecutions. For the reasons stated herein, Essex's cross-motion for summary judgment is granted, and the Derderians' motion for summary judgment is denied.
Counsel shall prepare an appropriate judgment for entry.
[1] Section 11-23-3(a) of the Rhode Island General Laws provides: Every person who shall commit manslaughter shall be imprisoned not exceeding thirty (30) years.
[2] On September 29, 2006, the Derderians pled nolo contendere to Counts 101-200 of the indictments against them. Counts 1-100 were dismissed by court order on the same date.
[3] Section 12-28-5 provides:
 (a) Upon his or her final conviction of a felony after a trial by jury, a civil judgment shall automatically be entered by the trial court against the defendant conclusively establishing his or her liability to the victim for any personal injury and/or loss of property that was sustained by the victim as a direct and proximate cause of the felonious conduct of which the defendant has been convicted. The court shall notify the victim at his or her last known address of the entry of the civil judgment in his or her favor and inform him or her that he or she must establish proof of damages in an appropriate judicial proceeding in order to recover for his or her injury or loss. This section shall not apply to crimes set forth in title 31 arising from the operation of a motor vehicle.
 (b) For the purposes of this section, "victim" is one who has sustained personal injury or loss of property directly attributable to the felonious conduct of which the defendant has been convicted. In homicide cases, judgment shall enter for the benefit of those parties eligible to commence a wrongful death action pursuant to chapter 7 of title 10.
[4] Damages are "[m]oney claimed by, or ordered to be paid to, a person as compensation for loss or injury." Black's Law Dictionary 416 (8th ed. 2004). Further, "Damages are the sum of money which a person wronged is entitled to receive from the wrongdoer as compensation for the wrong."Id. (quoting Frank Gahan, The Law of Damages 1 (1936)).
[5] G.L. 1956 § 11-1-2 provides that "any criminal offense which at any given time may be punished by imprisonment for a term of more than one year . . . is declared to be a felony."
[6] The Supreme Court has established that "[i]nvoluntary manslaughter is defined in Rhode Island as an `unintentional homicide without malice aforethought, committed either in the performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence.'" State v. Ortiz, 824 A.2d 473, 485 (R.I. 2003) (quoting State v. Hockenhull, 525 A.2d 926, 929 (R.I. 1987)) (further citation omitted).
[7] This Court notes that § 12-28-5 is not an exact codification of collateral estoppel. For example, the preclusive effects of § 12-28-5
apply only after trials by jury. Jury trials are not required for collateral estoppel to apply. See State v. Werner, 865 A.2d 1049, 1055
(R.I. 2005) (explaining that for collateral estoppel to apply, there must be "`(1) an identity of issues, (2) the previous proceeding must have resulted in a final judgment on the merits, and (3) the party against whom collateral estoppel is asserted must be the same or in privity with a party in the previous proceeding[]'") (quoting State v. Santiago,847 A.2d 252, 254 (R.I. 2004)). Also, § 12-28-5 does not distinguish between guilty pleas and pleas of nolo contendere. Some courts have found that "a plea of nolo contendere in an earlier criminal prosecution will raise no [collateral] estoppel, since that plea neither controverts nor confesses the facts upon which the conviction must rest." Hopps v. UticaMut. Ins. Co., 127 N.H. 508, 511, 506 A.2d 294, 297 (1985). This reasoning stems from collateral estoppel's requirement that the issues to which preclusion applies must have been actually litigated. Id. at 511,506 A.2d at 297; Lennon v. Dacomed Corp., 901 A.2d 582, 590 (R.I. 2006) (stating that collateral estoppel "makes conclusive in a later action on a different claim the determination of issues that were actually litigated in a prior action[]"); cf. Rent-A-Ride, Inc. v. Thomas,505 A.2d 424, 426 (R.I. 1986):
 `[i]t is a widely accepted rule that a conviction upon a plea of nolo contendere is not admissible in evidence in a subsequent civil suit on the same matter as an admission of guilt or as proof that the defendant committed the offense.' . . . This court has emphatically stated since the turn of the century that a nolo plea does not establish the fact of guilt for any purpose other than that of the case to which it applies. (citations omitted).
[8] The Restatement (Second) of Judgments explains the meaning of "nonmutual":
 At an earlier period in the development of res judicata doctrine, the `mutuality' requirement was an obstacle to applying issue preclusion in favor of such a third party. That is, since the third party would not have been bound in his civil action if the prosecution had resulted in an acquittal, under the mutuality rule it would follow that the third party could not take advantage of the issue determined in a conviction. However, long before the mutuality rule was repudiated in civil cases, well reasoned decisions had extended the rule of preclusion to operate in favor of third persons where the first action is criminal and the second is civil. Restatement (Second) Judgments § 85, comment e at 298 (1982).
[9] The Johnson Controls Court explained CERCLA as follows:
 The Act empowered the federal government, through the Environmental Protection Agency (EPA), to identify hazardous waste sites and pursue remedial activities. As part of the remedial process, the government was authorized to clean up properties and seek compensation from responsible parties or to require polluters and other responsible parties to perform the cleanup themselves. Johnson Controls, 665 N.W.2d at 262-263 (citing 42 U.S.C. §§ 9601-9675
(2000)).
[10] The language of insurance policies at issue in Johnson Controls
closely mirrors that of the Policy in the case at bar:
 The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of bodily [or personal] injury or property damage to which the policy applies, caused by an occurrence, and the company shall have the right and duty to defend any suit against the insured seeking damages on account of such bodily injury or property damage. . . . Johnson Controls, 665 N.W.2d at 265. *Page 1